IN

# THE SUPREME COURT

OF

# PENNSYLVANIA.

EASTERN DISTRICT—PHILADELPHIA, 1889.

## APPEAL OF ELLEN HARBSTER, ET AL.

[ESTATE OF WILLIAM HARBSTER, DECEASED.]

FROM THE DECREE OF THE ORPHANS' COURT OF BERKS
COUNTY.

Argued March 4, 1889—Decided March 18, 1889.
[To be reported.]*

(*a*) By a supplemental partnership agreement it was provided that on the death of either partner, the others, upon an option to be exercised within thirty days, might take his interest at its value as it stood on the company books at the last annual taking account of stock, with the accrued profits added or the losses deducted for the current year.

(*b*) One partner died in June; within thirty days thereafter, an election was made by the survivors to take the deceased partner's share under the terms of the agreement, and, in the settlement which followed accrued profits were added to July 21st, the date of the settlement, and not to the end of the current year.

1. In such case, as the interest of the deceased partner, in the firm, ended when the surviving partners gave notice of their election to take it under the terms of the agreement, it was not error to refuse to surcharge

---

* In this manner, i. e., "To be reported," will be designated the cases marked "to be reported," by the Court. The cases not so marked, but which are now to be reported under the act of March 28, 1889, P. L.    , will not have this designation. Heretofore, all the cases in the volumes of the present Reporter have been reported by himself, personally; hereafter, to enable him to publish promptly, as he will try to do, the reporting of the cases not ordered "to be reported" will be done by competent assistants, to be edited, however, by the Reporter.

his executors with the share of the accrued profits of the concern to the end of the business year.

2. Though the estate of the deceased was large and a considerable part of it received in securities accepted by the legatees as money, yet as it was successfully managed and the responsibility not lessened by the disposition of the legatees to hold the accountants liable for every error of judgment, the allowance of commissions and counsel fees made by the court below, under all the evidence, would not be disturbed.

Before PAXSON, C. J., STERRETT, WILLIAMS, McCOLLUM and MITCHELL, JJ.

No. 114 January Term 1888, Sup. Ct.

On May 6, 1886, the first account of Jacob Holl and John G. Mohn, executors of the will of William Harbster, deceased, was filed, showing a balance for distribution of $108,913.05. The only item upon the debit side of the account was charged as of date August 4, 1885, " To amount due estate realized from sale of decedent's interest in the Reading Hardware Company, which sum is exclusive of certain moneys retained by said company to cover certain contingencies which cannot be determined at present, $135,000." Credits were claimed, inter alia, for accountants' compensation, $6,750 ; for cash paid attorney for " professional services to decedent in his lifetime and to executors," $2,500.

On May 20, 1886, Ellen Harbster, widow, and Maggie Harbster, a daughter and legatee, filed the following exceptions to the said account.

" 1. The accountants have charged themselves with more money than has actually come into their hands, this for the purpose of laying ground for the charging of excessive commissions and counsel fees.

" 2. The accountants ask credit for the payment of claims against the estate which are excessive and were wrongfully paid.

" 3. The accountants ask credit for $2,500, cash paid J. H. Jacobs, Esq., professional services, etc., which amount is grossly excessive and out of all proportion to the services rendered.

" 4. The accountants' charges of $6,750 for compensation, is excessive and unreasonable."

On the hearing of the exceptions before the auditing judge, it was made to appear that the Reading Hardware Company was composed of W. M. Griscom, Matthan Harbster, H. C.

England and William Harbster, the deceased; that on March 21, 1885, the several partners executed an agreement under seal, entitled, a supplemental partnership agreement, which was as follows:

"The undersigned, members of 'The Reading Hardware Company,' in order to provide against loss and inconvenience that might otherwise result from the death or withdrawal of any of the partners, hereby agree that upon the death or withdrawal of any of the partners the remaining or surviving members, and such other persons as they shall mutually agree to associate with them or any one or more of them, and in such proportions as they shall mutually agree, shall have the right to take the interest of such deceased or retiring member at the price or value at which the same stands upon the books of the firm, at the last annual taking of account of stock, to which shall be added the proportion of profits or deducted the share of losses for the current year; provided, however, such option shall be exercised and election made within thirty days from the decease or withdrawal of such member, and thereupon the interest of such member shall cease and determine, and by virtue hereof said interest in said firm, all firm property, real and personal, shall pass to and vest in such survivors or acceptors, subject, however, to the payment of the heirs and legal representatives of such deceased partners, or to the withdrawing partner if living, of one third of such valuation or price in cash, and one fifth of the balance annually thereafter, with interest on the sums then unpaid until the whole price is paid; such payments to be satisfactorily secured by bond with securities, or otherwise, as may be agreed upon, and upon such payments being made and securities given, due legal and proper conveyances shall be executed and releases made and delivered by such withdrawing partner or the legal representatives of the deceased partner."

William Harbster died testate on June 16, 1885, leaving to survive him a widow, Ellen Harbster, six children, and two grandchildren, and bequeathing his estate to his widow and children in certain proportions. An election was made within the time limited, and a settlement concluded with the surviving partners on July 21, 1885, under the terms of the supplemental agreement quoted. The sum accounted for included

Adjudication.

the value of decedent's interest on January 1, 1885, with the accrued profits to the date of settlement.

After the testimony was closed, the exceptants on November 13, 1886, asked to have the accountants surcharged " with the amount of profits to which the estate was entitled under the agreement of March 21, 1885, from July 21, 1885, to January 1, 1886, amounting to                              $5,338.57

And interest to June 15, 1886,                          146.80
                                                    _____

                                                      $5,485.37

On February 11, 1887, the auditing judge, SCHWARTZ, P. J., filed the following decision :

The exception filed November 13, 1886, was in time. It seeks to have the accountants surcharged with the sum of $5,485.37. This is because it is contended they have made an improper settlement with The Reading Hardware Company, under the supplemental partnership agreement made March 21, 1855, by the members composing said company, viz.: William M. Griscom, Matthan Harbster, Henry C. England and William Harbster, the decedent. The sustainment of this exception depends upon the construction that.will be put upon said agreement. Its object was to provide for an adjustment and settlement of their company affairs in case of the death or withdrawal of any of its members. No testimony was offered as to.the terms under which the parties entered into the copartnership. Such being the case, the court takes it for granted that the contract was between the living without providing for a continuance of the business for the benefit of the estate of any of its members after his death. Partnership, unless otherwise agreed upon, terminates with the death of a member thereof. The above state of facts explains the object of the agreement.

The evident intent of it was to save and protect the survivors, as well as the representatives of the dead, from vexatious and expensive lawsuits, by fixing the value of the interest of the deceased or withdrawing partner, and by affording the surviving or remaining members an opportunity to accept upon such agreed price, and to pay for it in the way prescribed by the agreement. The agreement also covenants that the survivors

### Adjudication.

should elect within thirty days after the death or withdrawal of a member, to take or refuse to take under the agreement. They elected to accept the interest within the time stipulated. Their doing so necessarily terminated the copartnership so far as the decedent's estate was concerned. His estate and the representatives thereof had no further interest in the concern. Their interest consisted in what his share was worth at the time his surviving partners elected to take the same under the agreement.

In my opinion these supplemental articles were mainly intended for the protection of the survivors, and that it was at their option to accept or refuse the decedent's interest on the terms and conditions specified in their said agreement. There is no question but that they notified the executors of their intention to accept under it. It is, however, equally true that during the process of settlement they, the survivors, insisted upon the payment of the claims in cash. I do not see any reason in the articles or covenants therein why they should not be allowed to pay the decedent's interest in cash. This being so, it became the duty of the executors to seek for the best and safest and most remunerative investment for their cestuis que trust. The surviving partners having shown that they had an offer of a loan sufficiently large to pay their indebtedness at the rate of interest of five per cent per annum, free of taxation, and it being a fact that the funds in the hands of guardians, trustees, etc., are to a very large extent loaned under the order of the court at five per cent in this county, and all for the reason that money cannot be safely and securely invested here at a higher rate of interest, I find that the executors acted for the best interest of the estate. Under the agreement they were compelled to take the value of the decedent's share in cash. They invested, under the order of the court, the trust funds at a higher rate of interest than usual in the county. The evidence of G. B. Stevens, Esq., however, shows that Ellen Harbster, the widow, Maggie Harbster and Howard E. Harbster, two of the children and legatees, agreed to this settlement. This exception was filed after the testimony was fully heard, under the theory and impression that the evidence adduced fully sustained it. I am of opinion there is no testimony to sustain this exception. Hence the same is dismissed.

Adjudication.

The first exception to the account complains that the accountants charged themselves with more money than they had actually received, " for the sake of charging commission and counsel fees." The debt side of the account has no charges on account of the advancements, nor any items of specific legacies, nor legacies in specie. It complains that the accountants charged themselves with more than they received for the estate. This exception is an anomalous one. Under it exceptants' counsel seemingly contend that debtors should have ignored the executors, and settled their indebtedness with the legatees ; this, in order to deprive the executors of thier commissions and their counsel of his fees. The plain letter of the law militates against such a course and such doctrine. Executors and administrators have always been appointed to settle decedents' estates. It is their duty, and has always been, to collect the assets, to convert the effects into cash and therewith to pay decedents' debts, and the balance, if any, to the legatees as directed by the will, and in case of intestates, to the heirs under the intestate laws.

As to the second exception it needs only to be remarked that the accountants had proper vouchers for all credits claimed in their account, and that no evidence was offered showing improper payments by them. Hence it is disallowed.

The fourth exception objects to the compensation of accountants as excessive and unreasonable. The estate settled in this account amounts to $135,000. It shows that they paid out to liquidate debts, expenses incurred in settlement of estate, exclusive of accountants' commissions and counsel fees, and in satisfaction of specific money legacies, sums amounting to $16,736.95. The commissions charged and complained of are $6,750. His property, in so far as the same is contained in this account, appears to have been invested in said hardware company, but whether the entire amount was realized out of his partnership interest therein, or whether a part of it was a loan to the concern, is not disclosed by the testimony. This fund, except so much thereof as was required for the payment of debts and expenses, was kept continuously invested until paid to legatees, and re-invested in the name of the executors as trustees, for the use and benefit of such of the legatees as had only life interests in these legacies, with remainders over. It further

appears that the executors made a careful examination of the inventory of the firm's property and of the books and accounts of the concern, in order to get the full benefit for the decedent's estate out of the affairs of the company under said agreement. In doing so they discovered several errors in the inventory, which materially enlarged and increased the assets of the estate. The accountants claim to have increased the property of the company by from $8,000 to $10,000, and testified to changes to about $8,000.

The witnesses called on the part of the exceptants, on the contrary, testify that the increase did not exceed $3,000, and point out in what they consisted. The court, not deeming it to be of any consequence which of said witnesses were correct in their estimates, does not pass upon the credibility of their testimony. It was, however, conceded by all the witnesses that the accountants carefully examined into decedent's interest in said copartnership, and they devoted considerable time to ascertain its exact condition and value. Under these circumstances, it is evident to the court that the executors constantly kept in view, whilst settling this estate, the interests of the decedent's legatees. The court's construction of the agreement being correct, every act of the accountants is commendable. The accountants received from the hardware company $53,000 on August 4, 1885. Of this they paid to Ellen Harbster $30,000, and to Maggie Harbster $8,500. The balance, $14,500, they appropriated towards the payment of debts, expenses and specific money legacies. On this same day the said sum of $8,500 was set apart for the use of each of the cestuis que trust in the hands of said hardware company. The executors afterwards, on July 2, 1886, loaned $50,500 to said hardware company, on bond secured by mortgage on company's works, in trust for the use of their said cestuis que trust. This latter sum included the former sum of $8,500.

In passing upon the commissions, the services rendered in investing the trust funds must be eliminated from the services of the accountants as executors. The trust estates are alone and severally liable for said services. The question here arises, what are reasonable commissions for the accountants for their services, risks and responsibilities in the settlement of this estate, under the facts and circumstances adduced? The estate

Adjudication.

is a large one and required skill and attention. To reap its full value, personal knowledge and experience on the part of the executors were necessary. They had it. In fixing the amount of commissions the accountants are entitled to, the court should and will be guided by the decisions on similar facts and circumstances. Accountants' counsel cited Davis's Appeal, 100 Pa. 201. He contended that said case ruled this, and that under its rulings the accountants here were deserving the entire commissions charged by them. Exceptants' counsel cited Montgomery's Appeal, 86 Pa. 230, and insisted that this case was ruled by it. These two cases appear to be very much alike in their nature and character. The services rendered by the accountants were about the same in each case. In Davis's Appeal the assets aggregated $28,202.67, $25,000 of which were not converted, but remained in the form the executors received them. The court allowed him five per cent commission on the entire sum. In Montgomery's Appeal, the estate amounted to $42,385.93. The credits claimed for payments made aggregated $2,552.95; $37,304 of the assets remained unconverted. In this case the court allowed the accountants a commission of $500 and the further sum of $200 on conversion of certain specific assets. If these two cases are fully and correctly reported, an ordinary mind is incapable to reconcile them with each other.

Independent of these decisions, the books are full of adjudications on the question at issue, touching upon and treating in every conceivable point that may arise on accountants' commissions under any state of facts. Without comparing them with the one in question here, the matter will be disposed of under the general principles governing the subject. Accountants are usually allowed five per centage. Commissions are generally estimated by the size and nature of estates, by the trouble and risks incurred in converting them for distribution by liquidating and paying the debts against the estates, and in distributing the balance to the heirs and legatees. This having been a large estate, and the assets collected and prepared for distribution with less trouble, time and annoyance than is commonly the case in estates of this proportion, a commission of five per cent is, in my opinion, rather high and should be reduced. Five thousand seven hundred and fifty dollars is a proper and

Adjudication.

suitable remuneration for their services. This reduces the compensation $1,000, and they will have to be surcharged with the same.

The third exception objects to the credit taken of $2,500, for cash paid J. H. Jacobs, Esq., for professional services, etc., as being grossly excessive and out of all proportion to the services rendered. This credit is alleged to be for professional services rendered the decedent in his lifetime, and for the services to the executors in settling the estate.

The evidence of James R. Kenney and H. P. Keiser, is that they have been with Jacobs in his office for a number of years; that William Harbster, the decedent, was a client of Jacobs during the latter years of his life; that he supervised and dictated decedent's will; that he did other business for him; that he visited the office of Jacobs for the purpose of consulting him, and that he had frequent and lengthy consultations with him. They do not know whether or not Jacobs was paid for these services. Nor is there any other testimony showing payment. This testimony is somewhat indefinite in that it does not show any value or estimate for the services rendered. Under the circumstances it is, however, the best testimony that the nature of the case admits of. The services rendered by Jacobs to the accountants were valuable, and required considerable time and attention on his part. He directed the mode of settlement with the hardware company under their agreement with decedent, and construed the same. This was an important matter to the estate. His counsel in the premises was the proper one, and conduced to the enhancement of it. Besides this there was considerable trouble connected with the settlement of this estate, and the usual and ordinary labors connected with decedent's estate. Mr. Jacobs is an attorney of twenty-three years standing in this county, of good repute with the court and bar thereof. He has a large and remunerative practice. As such, his charges would naturally be more than those beginners and young men just entering the profession. Judges throughout the commonwealth have usually refused to interfere with the fees of counsel for their professional services, under the plea that they were unable to estimate and value them, as they could the claims of other people. But inasmuch as Mr. Jacobs openly said in court, when this case was

heard, that he would be satisfied with what the court might allow him, and I, knowing that he meant what he said, will fix his fees for his services rendered to the estate, and the decedent while living, at the sum of $2,000. The estate will be surcharged $500 on that account.

The foregoing adjudication having surcharged the accountants with the sum of $1,500, a distribution of the increased balance was ordered according to the terms of the will. Thereupon exceptions were filed on behalf of the accountants to the finding of the auditing judge that, whether a portion of the estate "was a loan to the concern, is not disclosed by the testimony." Exceptions were filed also on behalf of the widow and legatees, covering the following subjects :

1. The refusal of the auditing judge to surcharge the accountants with the decedent's share of the profits from July 21, 1885, to January 1, 1886, to wit, the sum of $5,338.56, and interest thereon.

2. The allowance by the auditing judge to the accountants of $5,750, as compensation, and of $2,000, as counsel fees.

On October 22, 1887, the auditing judge filed a supplemental decision, sustaining the exception filed by the accountants, and finding that the fund for distribution arose wholly out of the decedent's partnership interest. The exceptions filed on the part of the legatees were then dismissed, and the distribution as reported confirmed. Thereupon the widow and others, legatees, took this appeal, and assigned the dismissal of their said exceptions and the confirmation of the adjudication as error.

*Mr. H. D. Green* and *Mr. A. G. Green*, for the appellants.

*Mr. J. H. Jacobs* (with him *Mr. H. P. Keiser*), for the appellees.

PER CURIAM:

The court below was entirely right in its construction of the supplemental partnership agreement of March 21, 1885. That agreement provides that upon the death of a partner the surviving partners shall have the right to take his interest at its value as it stood upon the books of the firm, with the accrued profits added or the losses deducted for the current year ; pro-

vided that such option shall be exercised within thirty days from the death of such partner, and that after such option and election the entire interest of the deceased partner shall pass to the surviving partners, subject to payment for his interest, in the manner and at the times provided in said articles. It requires no argument to show that the interest of the deceased partner ended when the firm gave notice that they would take it in accordance with the terms of the agreement. It follows that the court below committed no error in refusing to surcharge the accountants with the sum of $5,338.37 as the share of profits which accrued from July 21, 1885, to January 1, 1886, the close of the current year.

The only other question that is raised by this record is that of the accountants' commissions and the amount paid for counsel fees. The commission allowed by the court below was a fraction over four per cent, and, while it amounted to a considerable sum, we are not prepared to say the court below erred in allowing it. As far as we can judge from what is before us, the estate appears to have been carefully and successfully managed. The responsibility was by no means inconsiderable, and was not lessened by the manifest disposition of the heirs to hold the accountants responsible for every error of judgment. This is shown in their attack upon the accountants' mode of settling with the surviving partners and their construction of that instrument. Nor is there any force in the objection that but a small portion of the estate passed through the hands of the accountants in cash. A considerable part of what they received from the firm was in the shape of securities which were accepted by the heirs in lieu of money. They were the equivalent of money; the labor and responsibility of the settlement were quite as great as though they had received the cash. The learned judge below had all the facts before him which were necessary to an intelligent decision of this question, and we are not able to see any such manifest error as needs correction here. The same remark may be made as to the allowance of $2,000 for counsel fees. We are not informed of the precise nature and extent of the services rendered. They included not only the services to the accountants in the settlement of the estate, but also to the testator in his lifetime. It would have been more satisfactory had these items been

separated. The court below fixed the compensation for both in a round sum, and upon evidence that we must presume was satisfactory. There is nothing before us which would justify us in saying that the amount was too large.

The decree is affirmed and the appeal dismissed at the costs of the appellants.